**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **KENNETH HARRIS** | § | |
| **and HOLLY HARRIS** | § | |
|     Plaintiffs,** | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| **DOMINGO RIVERA,** | § | |
| **ANGELO DRAGIJA, AND** | § | |
| **JOSEPH R. MULLEN, JR.** | § | |
|     Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE PRESIDING:**

COMES NOW, KENNETH HARRIS and HOLLY HARRIS, Plaintiffs and file this Original Complaint and would respectfully show the Court as follows:

### I. PARTIES

1.1   Plaintiffs, Kenneth Harris and Holly Harris, are citizens of the United States and are residents of the State of Texas.

1.2.   Defendant Domingo Rivera is a natural person whose residence is presently unknown to the Plaintiffs. Service is being attempted by agreement through the City Attorney for the City of Dallas.

1.3   Defendant Angelo Dragija is a natural person whose residence is presently unknown to the Plaintiffs. Service is being attempted by agreement through the City Attorney for the City of Dallas.

1.4     Defendant Joseph R. Mullen, Jr. is a natural person whose residence is presently unknown to the Plaintiffs. Service is being attempted by agreement through the City Attorney for the City of Dallas.

1.5     Defendants are sued herein solely in their individual or personal capacities.

## II. JURISDICTION AND VENUE

2.1     This Court has jurisdiction of this case pursuant to 42 U.S.C. § 1983 because this suit involves a claim that the Defendants, acting under color of state law, violated the constitutional rights of Plaintiff Kenneth Harris (hereinafter sometimes referred to as "Captain Harris") under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States. The Court also has pendant or supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. The state law claims are part of the same case or controversy that gives rise to the federal question claim.

2.2     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) because the acts complained of in this suit occurred in Dallas County, Texas as is more fully set forth within the body of the Complaint.

## III.  CONDITIONS PRECEDENT

3.1     All conditions precedent to the institution of this action have been performed or have occurred. No claim is made against any governmental entity and no notice of this claim is required. Alternatively, the City of Dallas and each of the Defendants have actual knowledge of all matters alleged herein.

## IV.  FACTUAL BACKGROUND OF THE LITIGATION

4.1     At all times relevant to this suit, Plaintiff Kenneth Harris was employed by the City of Dallas Fire-Rescue Department as a Captain, in which capacity he commanded an engine

company located in the northwestern portion of Dallas. At approximately 3:16 a.m. on October 26, 2008, Captain Harris' engine company received an emergency call involving a traffic collision in which persons had been injured and a vehicle had overturned. The collision was believed to be located on southbound Interstate Highway 35 or Stemmons Freeway, near its intersection with Royal Lane. Captain Harris' engine proceeded to the location on an emergency basis. Upon arrival, in accordance with the policies of the department, he assumed the position of incident commander. Also, in accordance with departmental policy, Captain Harris ordered certain other responding Dallas Fire Rescue units to assume a blocking position so as to prevent vehicles approaching from the north (in the southbound lanes) on I-35 from colliding with emergency equipment or responders and/or the vehicles involved in the traffic collision, as well as to assure a safe area within which fire-rescue department personnel could work to treat the sick and injured and to extricate them from the wrecked vehicle. This area of Stemmons Freeway at that hour is known to be extremely dangerous for emergency operations, particularly after the closing time for the numerous establishments that sell alcoholic beverages in the immediate area.

4.2     Also, in accordance with department policy, Captain Harris notified the City of Dallas dispatcher by radio that he needed one wrecker to remove an inoperable and damaged vehicle that was involved in the collision and was overturned. The dispatcher acknowledged this request and stated the wrecker had been ordered. After some period of time had passed and the Dallas police had not responded to the location, Captain Harris initiated another radio call to ascertain that police had been assigned. The dispatcher responded that no police units were available despite the imminently serious conditions, which were rapidly worsening because of the absence of traffic and bystander control by the police department.

4.3	Captain Harris again contacted the dispatcher and again requested police units to respond on an emergency basis. Sometime thereafter, the Defendants Rivera and Dragija separately arrived on the scene. Each officer was driving a marked police vehicle. All the Defendants are police officers of the City of Dallas.

4.4	Captain Harris was informed that Defendant Rivera, who was a uniformed patrol officer, was to be in charge of the accident investigation. Captain Harris then approached Defendant Rivera asking, in substance, if the police department still normally responded on a "Code 3" or emergency basis to freeway incidents. Defendant Rivera told Captain Harris that how and when the police department responded to such calls was a policy question and if Captain Harris wanted to know, he could ask the chief of police, or words of like import.

4.5	Shortly thereafter, Captain Harris again approached Defendant Rivera and asked him if he (Defendant Rivera) knew what had happened to the wrecker that Captain Harris previously ordered. The Defendant Rivera did not respond to this question. At that time, Defendant Rivera was facing partially away from Captain Harris and Captain Harris thought that because of the extreme noise and confusion in the area that Defendant Rivera might not have heard him. Accordingly, Captain Harris approached Defendant Rivera and lightly placed two fingers of his right hand on Defendant Rivera's arm to attempt to get Defendant Rivera's attention and in order to be sure that he was heard. Such action by the Plaintiff was in no way violent or offensive to a reasonable person of ordinary sensibility.

4.6	Suddenly, Defendant Rivera turned toward Captain Harris in an aggressive and violent manner, grabbed his arm, doubled his arm behind Captain Harris' back, slammed Captain Harris against the side of the fire engine and handcuffed Captain Harris' hands very tightly behind his back. When Captain Harris demanded to know what the Defendant Rivera thought he

was doing, Defendant Rivera told Captain Harris he would be charged with aggravated assault on a police officer and would be taken to jail. This was despite the fact that Captain Harris had done nothing wrong, was then the duly authorized incident commander for the scene, and was, at that time, actively supervising operational and rescue efforts by fire-rescue department personnel.

4.7     There was absolutely no probable cause to arrest Captain Harris for any offense. Moreover, the force used against Captain Harris was objectively unreasonable and completely unnecessary. Although justified in doing so, at no time did Captain Harris resist Defendant Rivera's unlawful effort to arrest him.

4.8     Upon information and belief, the Defendant Dragija actually witnessed the actions of Defendant Rivera and heard the statements and remarks made by the Defendant Rivera to Captain Harris. As a sworn police officer, Defendant Dragija was obligated, by law, to protect the rights of all persons including those of Captain Harris, if necessary, from abuse by another police officer. Instead, the Defendant Dragija stood by and did nothing to prevent the unlawful assault, battery, seizure and/or arrest of Captain Harris by the Defendant Rivera.

4.9     Captain Harris instructed his engine crew not to confront the police officers or to attempt to free him, but rather to contact the nearest battalion chief of the Dallas Fire-Rescue Department and to request him to come to the scene at once. Captain Harris' engine crew complied with this request and shortly thereafter Dallas Fire-Rescue Battalion Chief A.W. Walker arrived at the location.

4.10    Meanwhile, upon information and belief, Defendant Rivera realizing that he had acted improperly and unlawfully, completely outside of normal police communications, privately telephoned the Defendant Mullen, who was a police sergeant and Defendant Rivera's regular

supervisor to ask the Defendant Mullen to personally come to the location. Upon information and belief, Defendant Mullen, although off duty at the time, nonetheless came to the location in his personal vehicle, and undertook to act as a police supervisor although he had no official or proper reason to be at the scene at all. Upon information and belief, Defendant Rivera requested the Defendant Mullen to come to the location and assist him in this situation because a competent and independent police supervisor would have immediately recognized that Defendant Rivera's action was unlawful and improper, would have ordered Captain Harris to be released from custody, and would never have allowed Captain Harris to be arrested, detained or to be transported to jail.

4.11   Apparently believing the defense was a good offense, the Defendant Mullen telephoned Dallas Police supervisors at the Dallas County Jail and attempted to have them to approve in advance the arrest of the Plaintiff for at least two entirely fictitious offenses. The first fictitious offense was that the Plaintiff had somehow interfered with a public servant in performance of his duties. The second was the Plaintiff had committed an assault on a public servant which was a felony. Notwithstanding his zeal to make these fictitious charges, the Defendant Mullen was advised on multiple occasions by the supervisors that based on Defendant Mullen's description of the incident, the matter should be handled in the field, (i.e. no custodial arrest should be made) and further that the highest charge the supervisor would accept would be a misdemeanor assault charge for supposedly "offensive contact." Defendant Mullen was also advised in a separate telephone conversation that the matter had been discussed with the Assistant District Attorney who was acting as a legal advisor for the Dallas Police Department, who also stated that the most serious charge that could be made against the Plaintiff would be misdemeanor assault for offensive contact, a Class C misdemeanor. The significance of this

information to Defendant Mullen was that he knew the Dallas Police Department actively discouraged, if not affirmatively prohibited, the making of custodial arrests for minor offenses such as a Class C misdemeanors and further that appropriate action would be for him, as instructed, "to handle the matter in the field," i.e. have one of the officers issue the Plaintiff a ticket or citation to appear.  Unsatisfied with these legal impediments and disregarding the supervisors' advice, and the policies of the Dallas Police Department, Defendant Mullen nonetheless ordered the Plaintiff to be placed in custody, arrested and placed in a patrol car with his hands handcuffed behind his back.  He further instructed Defendant Dragija to act as the "arresting officer" although Defendant Dragija was not in fact the arresting officer.  In addition, Defendant Mullen instructed Defendant Dragija to transport the Plaintiff to jail and to charge him with felony assault on a public servant.  At the time he took this action, Defendant Mullen knew: (1) there was absolutely no factual or legal basis to charge the Plaintiff with felony assault on a public servant; and (2) that he had been previously told not once but at least twice not to charge the Plaintiff with anything but if he insisted any charge should be limited to a misdemeanor Class C offense of assault by offensive contact for which the Plaintiff should simply be issued a citation.  On information and belief, the Defendant Mullen subscribed to the view that while the Plaintiff might "Beat the rap he wouldn't beat the ride."  This phrase in police jargon means that if an innocent person is charged with a criminal offense and ultimately acquitted, he or she will nonetheless be forced to endure the humiliation of being arrested and charged with a crime and will be forced to incur the expense of engaging the services of an attorney to represent him.  Thus, the citizen will be taught a lesson: do not "mess" with the Dallas Police.

    4.12       While at the scene, Defendant Mullen never spoke with Captain Harris, but did speak directly with Chief Walker.  Chief Walker requested that Captain Harris be immediately

released to return to his duties and that any disagreement be resolved in a civil and non-confrontational manner at a later time, elsewhere, and not in the middle of the scene of an emergency. Defendant Mullen refused to talk further with Chief Walker and implied that if Chief Walker did not immediately cease all contact with police department personnel, he would also be arrested. Being so informed, Chief Walker walked away and took over command of the incident to protect fire department personnel, the victims, and the damaged vehicles.

4.13    Sometime thereafter, Captain Harris was placed in a police vehicle occupied by Defendant Dragija, ostensibly to be taken to the Lew Sterrett jail facility in downtown Dallas. While in the police vehicle with Defendant Dragija, the Defendant Dragija repeatedly told the Plaintiff that he wanted the Plaintiff to clearly understand Defendant Dragija had no part in the decision to arrest him or to file any charges against him. In particular, Defendant Dragija told Captain Harris he did not want to be involved in "this mess" in any way and that "it should not have gone down like this," but that he had been ordered by Defendant Mullen to act as the arresting officer (although he was not in fact the arresting officer) and to transport Captain Harris to jail. Defendant Dragija repeatedly stated he "was just following orders."

4.14    While en route to the jail, Captain Harris was both surprised and frightened when, after receiving a radio and/or telephone call, the police vehicle suddenly pulled off the freeway into a darkened area near the parking lot of a Shell service station where it was soon joined by several other Dallas police vehicles and police officers. Captain Harris could not see the other officers clearly but believed that both the Defendants Rivera and Dragija were present. Captain Harris feared that he could be beaten or worse. Instead, after a lengthy delay, no explanation was provided to Captain Harris as to why in violation of police policy he had been taken to a secluded area and left in the squad car while he was supposedly being transported to the jail.

4.15    Upon arrival at the Lew Sterrett jail facility, Captain Harris was forced to enter the facility in his departmental uniform with his hands still handcuffed behind his back.  Shortly after his arrival, Captain Harris was brought before a "book in" police supervisor.  When this individual asked Defendant Dragija what Captain Harris was being charged with, Defendant Dragija stated "Aggravated assault on a police officer."  The book-in Sergeant then left the area and a higher ranking police official, believed to be a lieutenant, promptly appeared and told the Defendants Rivera and Dragija: "This ain't going down like this, don't write another thing until you hear from me."

4.16    At this point Captain Harris was taken away to another area where his handcuffs were removed.  He was forced to take off all his clothing except for his underwear and was told to put on an orange jumpsuit that was several sizes too small.  He requested but was not given shoes for his feet.  Captain Harris was then "processed," and forced to sit in a holding area occupied by inmates who laughed at and ridiculed him.  During this period, Captain Harris requested that he be allowed to go to the restroom and was allowed to do so but was forced to stand in his socks in large puddles of urine in order to use the restroom.  He was then returned to the holding area.

4.17    Sometime thereafter, Captain Harris was advised that the charges against him had been "reduced" to "offensive contact" and that he would be released from jail on his own recognizance without the requirement of posting any cash bond.  The Defendant Dragija then wrote the Plaintiff a citation and Captain Harris was "released" to Chief Walker at approximately 7:15 a.m.

4.18    At all times relevant to this suit, each of the Defendants was acting under color of state law and was subject to the regulations of the City of Dallas Police Department.

4.19     Captain Harris sustained painful injuries to his shoulder, back, and neck as a result of being thrown forcibly into the fire engine and also to his wrists and hands from being forced to sit for a long period of time with his hands very tightly handcuffed behind him.  Such injures were significant, severe, and required medical treatment.  In addition, Captain Harris endured hours of humiliation and embarrassment while being forced to sit in a jail with common criminals and also while handcuffed in uniform at the accident scene in full view of public.  Thereafter, reports of this incident were widely circulated within the Dallas-Ft. Worth news media and within the Dallas Fire-Rescue Department which damaged Captain Harris' personal and professional reputation.

4.20     Following the arrest and release of Captain Harris, the City of Dallas Police Department and the City of Dallas Fire Rescue Department each conducted independent investigations of the conduct of all parties. During the course of this investigation, each of the Defendants were required to give written statements under oath to both police and fire rescue department investigators.  In the course of both investigations, each of the Defendants attempted to manufacture evidence to support the groundless charges against Captain Harris and actively perjured themselves as to the actual events and circumstances.  These actions included, but are not limited to the following.  The Defendant Rivera falsely described the Plaintiff as red faced and enraged toward the Defendant Rivera; Defendant Rivera falsely stated that Captain Harris had violently struck Defendant Rivera in the chest on two different occasions with sufficient force to knock him backward but not to knock him down, that the Plaintiff had impeded Defendant Rivera's access to the scene or had blocked his ability to proceed, and that the Plaintiff had dared the Defendant Rivera to arrest him. The Defendant Dragija also repeatedly perjured himself by affirming the essential details of Defendant Rivera's account although he

knew Defendant Rivera's account to be false and by "verifying" certain events he claimed to have observed but did not in fact observe at all. The Defendant Mullen also attempted to create evidence and justification to support the baseless charges by claiming to his superiors that he Mullen did not actually want to make the arrest but did so because Dallas Fire Rescue Department officials (presumably Chief Walker) were not "cooperative" and therefore presumably needed to be taught a lesson. This action by Defendant Mullen was despite the fact that Captain Harris had no control over the actions of Chief Walker and that the actions of Chief Walker had absolutely nothing to do with whether or not Captain Harris had committed any criminal offense.

4.21   One of the purposes of the Defendant Mullen in making the fictitious felony charge of assault on a public servant was to prolong the time that Captain Harris would be forced to remain in jail. In particular, the Defendants knew and Defendant Mullen had specifically been told that if Captain Harris was charged with any felony offense, he could not be arraigned until after 4:00 o'clock on Saturday afternoon which would guarantee that Captain Harris would spend all day Saturday in jail assuming that he could arrange for legal representation and could post a bond following arraignment. It was the object and intent of all the Defendants to create as much difficulty, hardship, and humiliation for Captain Harris as possible using their power and authority as Dallas police officers to do so.

4.22   By virtue of the Defendants participation in the foregoing acts, a criminal prosecution was instituted by the City of Dallas to seek the conviction of Captain Harris on the fictitious charge. On numerous occasions, Captain Harris was forced to appear in court to answer the charge and on numerous occasions, his case was delayed, postponed or continued at the request of the prosecution. On one occasion, the charges against Captain Harris were

dismissed following an adverse ruling by the trial judge but then were re-filed by the City resulting in multiple additional settings and re-settings of the case.  The Plaintiff was subjected to all this prosecution because of the conduct of the Defendants.

4.23     In March 2011, the case against Captain Harris was called to trial and the Defendants Rivera and Dragija testified against him.  Specifically, both the Defendants Rivera and Dragija repeated their false and perjured testimony essentially as they had given it to fire and police investigators. Both the Defendant Rivera and the Defendant Dragija testified unequivocally at the trial that the alleged assault of Defendant Rivera by Captain Harris had occurred between the location of Defendant Dragija's patrol car and the fire engine that Captain Harris was commanding. Unknown to the Defendants, a dash cam video of the incident had been obtained by the defense which showed that contrary to the testimony of both Defendants Rivera and Dragija there was in fact no physical confrontation between Defendant Rivera and Captain Harris at that time or at that location.

4.24     On March 31, 2011, the criminal charges against Captain Harris were dismissed following a lengthy jury trial which resulted in a mistrial. As of this date, all criminal charges against Captain Harris have been terminated in his favor. In fact, Captain Harris is and always has been completely innocent of all such charges.

### V.    COUNT ONE: VIOLATION OF 42 U.S.C. § 1983 FOR FALSE ARREST, ILLEGAL SEIZURE, AND THE USE OF EXCESSIVE AND UNREASONABLE FORCE

5.1     Plaintiffs hereby adopt and incorporate the preceding paragraphs 1.1 through 4.24.

5.2     The conduct of the Defendants constituted a violation of Captain Harris' right to be free from unreasonable arrest or seizure of his person without probable cause as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.  Defendants

conduct was further in violation of Captain Harris' right to be free from the use of objectively unreasonable, unnecessary, and excessive force as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.

5.3     Such rights of Captain Harris were clearly established in law at the time of the conduct complained of and were actually known to the Defendants at that time.

5.4     Such conduct of Defendants has caused Captain Harris to sustain and suffer significant injuries and damages.

### VI.     COUNT TWO: VIOLATION OF 42 U.S.C. § 1983 FOR CAUSING AND PARTICIPATING IN THE UNLAWFUL PROSECUTION OF CRIMINAL CHARGES USING MANUFACTURED EVIDENCE AND PERJURED TESTIMONY WITHOUT PROBABLE CAUSE

6.1     Plaintiffs hereby adopt and incorporate the preceding paragraphs 1.1 through 4.24.

6.2     The conduct of the Defendants also constituted a violation of Captain Harris' right to be free from the unlawful institution and prosecution of criminal charges based on manufactured evidence and perjured testimony as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

6.3     Such rights of Captain Harris were clearly established in law at the time of the conduct complained of and were actually known to the Defendants at that time.

6.4     Such conduct of Defendants has caused Captain Harris to sustain and suffer significant injuries and damages.

### VII.     COUNT THREE: CONSPIRACY TO VIOLATE 42 USC § 1983 AND THE PLAINTIFF'S CIVIL RIGHTS

7.1     Plaintiffs hereby adopt and incorporate the preceding paragraphs 1.1 through 4.24.

7.2     Defendants, individually and collectively, formed and carried out an agreement, combination and plan constituting a conspiracy to participate in the commission of each of the constitutional violations as set forth in Counts One and Two.  Each of the Defendants supported the other in the making of the original false arrest, in the use of unlawful and excessive force, in the falsifying of government reports and records, by giving false testimony to investigators and by giving false testimony at trial.  The Defendants committed numerous overt acts in the furtherance of such conspiracy, most of which were unlawful and some of which may have been lawful, but all of which were taken for the purpose of carrying out and completing the unlawful object of the conspiracy, which was to use their respective power as police officers to abuse, damage, and humiliate Captain Harris without privilege, justification, or excuse.  Such conspiratorial conduct by the Defendants is independently actionable under 42 U.S.C. § 1983.

7.3     Each of the Defendants acted willfully, deliberately, maliciously, or with reckless disregard for Captain Harris' clearly established constitutional rights at the time of the conduct complained of.

7.4     Such action and conspiracy by the Defendants has caused Captain Harris to sustain and suffer significant injuries and damages.

### VIII.   COUNT FOUR: STATE LAW CLAIMS

8.1     Plaintiffs hereby adopt and incorporate the preceding paragraphs 1.1 through 4.24.

8.2     The Defendants committed a variety of state law violations of Captain Harris' rights including false arrest, the use of excessive and unreasonable force, unlawful seizure of his body, false imprisonment, and unlawful filing and malicious prosecution of criminal charges against Captain Harris when each of the Defendants knew or should have known all such acts

were groundless and without any basis in fact. Such acts were done without privilege, justification or excuse. Such conduct was a proximate cause of the damages sustained by Captain Harris as have been or will be alleged with particularity herein.

## IX.   DAMAGES TO CAPTAIN HARRIS

9.1   As a direct and proximate result of the Defendants' conduct as previously alleged in detail, Captain Harris has suffered the following injuries and damages:

  a. mental anguish in the past and in the future;

  b. physical pain and suffering in the past and in the future;

  c. damage to his personal and professional reputation in the past and in the future;

  d. loss of consortium in his marriage in the past and in the future; and

  e. the reasonable and necessary value of the attorney's fees incurred in defense of the criminal charges filed against him;

## X.   DAMAGES SUSTAINED BY HOLLY HARRIS

10.1   Holly Harris is joined herein as a Plaintiff because she, as Captain Harris' lawful wife, has independently suffered a loss of consortium with her husband as a direct and proximate result of the Defendants' conduct.

## XI.   EXEMPLARY DAMAGES

11.1   The Plaintiffs would show that the actions of the Defendants as aforesaid were wilful, malicious, intentional and/or grossly negligent and were taken in utter disregard of the public trust reposed in the Defendants by the citizens of the City of Dallas and the State of Texas. Therefore, the Plaintiffs seek punitive or exemplary damages in such an amount as may be found sufficient by the trier of fact to punish these Defendants and to deter others with similar lawless inclinations in the future.

## XII. PRAYER

PREMISES CONSIDERED, Plaintiffs pray:

1. Plaintiffs recover judgment against the Defendants jointly and severally for all actual damages sustained by them;

2. Plaintiffs recover reasonable attorney's fees for the prosecution of this action as provided by 42 USC § 1988;

3. Plaintiffs recover all exemplary damages awarded to them;

4. Plaintiffs recover prejudgment and post judgment interest at the highest rate allowed by law, for all costs of this action and for any other relief at law or in equity to which they may show themselves justly entitled.

Respectfully submitted,

**AYRES LAW OFFICE, P.C.**

By: __/s/ R. Jack Ayres, Jr.__
**R. Jack Ayres, Jr.**
State Bar No. 01473000

By: __/s/ Christopher S. Ayres__
**Christopher S. Ayres**
State Bar No. 24036167

4350 Beltway Drive
Addison, TX 75001
972-991-2222 (Telephone)
972-386-0091 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**